J-A01028-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANDRE R. SMITH, | : | |
| | : | |
| Appellant | : | No. 3266 EDA 2018 |

Appeal from the Judgment of Sentence Entered May 7, 2018
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0001819-2016

BEFORE: NICHOLS, J., MURRAY, J., and COLINS, J.[*]

MEMORANDUM BY MURRAY, J.: **FILED FEBRUARY 04, 2020**

Andre R. Smith (Appellant) appeals from the judgment of sentence imposed after a jury convicted him of first-degree murder and possessing an instrument of crime.[1] Upon review, we affirm.

The trial court recounted the evidence presented at trial as follows:

> The operative facts of the matter involve [Appellant] stabbing his former friend Grayling Chambliss in the chest and abdomen five (5) times with a butcher knife, procured from his girlfriend's kitchen before he answered the front door, shortly after midnight on May 11, 2016, such that the knife penetrated the victim's lung, heart, and aorta, reaching at one point to the victim's vertebrae, and also tore out the victim's small intestine, which caused the victim's small intestine to protrude from his abdominal cavity. (Trial Transcript, 2/26/18, 55-56, 72-78, 94, 110, 132, 208-09; Trial Transcript, 2/27/18, N.T. 253, 259-60,

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(a) and 907(a).

276-77, 289, 307, 309, 311, 329-30; Trial Transcript, 2/28/18, N.T. 638, 646, 649, 655-56; Trial Transcript, 3/1/18, N.T, 837; 2/26/18, Ex. C-5A; 2/27 /18, Ex. C-1 OR; 2/28/18, Ex. C-69). The victim died within minutes. (Trial Transcript, 2/28/18, N.T. 651).

The murder occurred while [Appellant] was experiencing the psychotropic effects of his voluntary ingestion of "wet", i.e., PCP-laced marijuana, most likely earlier in the evening while he was at a bar drinking with his cousin. (Trial Transcript, 2/26/18, N.T. 64-66, 135-37; Trial Transcript, 2/27/18, N.T. 256-57, 266-71, 281, 284-85, 303, 421, 429-30, 435-36, 438-51; Trial Transcript, 2/28/18, N.T. 480; Trial Transcript, 3/1/18, N.T. 831). Immediately after stabbing Mr. Chambliss, [Appellant] ran into the bathroom of his girlfriend's home, removed all of his own bloody clothes, ripped the toilet/toilet tank from the wall/floor, and jumped naked out of a second story window onto the pavement below, fracturing his own heel and ankle and sustaining various abrasions to his body in the process. (Trial Transcript, 2/26/18, N.T. 57, 65-66, 95-96, 122, 159; Trial Transcript, 2/27/18, N.T. 261-62, 380, 385-86, 389; Trial Transcript, 2/28/18, N.T. 494-500, 615-16, 620, 622-24; Trial Transcript, 3/1/18, N.T. 840-42; 2/27/18, Ex. C-10Q). In a police interview conducted a couple hours later at the hospital, which was played for the jury, [Appellant] told one Detective Raech, "So I know the only rea- and the only way for me to kill this man and like to stop him from fightin' me I gotta stab him in his heart." (2/28/18, Exs. C-43, C-43A at 26, C-43B at 17).

[Appellant], who testified on his own behalf at trial, advanced the theory that due to his mental illness and voluntary intoxication on the night of the murder, he was unable to form the specific intent to kill and he claimed he acted in self-defense, on the basis that he was allegedly afraid of Mr. Chambliss, who, according to the defense, had a twenty-year old conviction for Simple Assault, two (2) arrests for Rape, and was known to [Appellant] to carry a gun. (Trial Transcript, 2/26/18, N.T. 50-51; Trial Transcript, 3/1/18, N.T. 828, 833-37, 871; Trial Transcript, 3/2/18, N.T. 917-919, 921, 947). The defense alleged that Mr. Chambliss had been calling [Appellant] repeatedly on his cell phone that evening and trying to contact him in person by knocking on [Appellant's] girlfriend's door, interrupting the [Appellant's] family and prayer time, and was trying to forcibly enter [Appellant's] girlfriend's home, where [Appellant] was

staying, after being warned to go away. (Trial Transcript, 3/1/18, N. T. 833-37). Mr. Chambliss's persistence in contacting [Appellant] may have been occasioned by a drug debt that Mr. Chambliss wished to reimburse to [Appellant], who had previously supplied Mr. Chambliss with controlled substances. (Trial Transcript, 3/1 /1 8, N.T. 827, 836-37).

Despite his attorneys' attempt to persuade the jury that [Appellant] could not have formed the specific intent to kill Mr. Chambliss due to his mental illness and voluntary drug intoxication, [Appellant] testified, notwithstanding the toxicology report, that he had not smoked PCP on the day of the murder and that he was not high on the drug at the time he committed the offense. (Trial Transcript, 3/1/18, N.T. 844, 849).

Trial Court Opinion, 3/27/19, at 2-3.

After a six-day trial, the jury rendered guilty verdicts on March 2, 2018. On May 7, 2018, the trial court sentenced Appellant to life imprisonment. Appellant filed a timely post-sentence motion on May 16, 2018, which the trial court denied on October 9, 2018. Appellant filed this timely appeal. Both the trial court and Appellant have complied with Pennsylvania Rule of Appellate Procedure 1925.

Appellant presents four issues for our review:

I. Was the finding of guilt on the charge of Murder of the First Degree pursuant to 18 Pa.C.S.A. §2502 (a) against the weight of the evidence?

II. Did the trial court err in its November 3, 2017 order directing the defense, in the event defense expert, Dr. Gerald Cooke, testified, to disclose the raw data relied upon in making his expert report as well as Appellant's responses to these tests?

III. Did the trial court err in failing to sanction the Commonwealth, as requested by the defense, for disclosing an EMT report after the parties had picked a jury?

IV. Did the trial court err in allowing video footage obtained from

police officer body cameras which depicted the decedent's body?

Appellant's Brief at 5.

In his first issue, Appellant assails the weight of the evidence, arguing that he was incapable of forming the specific intent to kill because the evidence from the Commonwealth's expert, Dr. Richard Cohn, established that Appellant's cognitive faculties were "significantly and measurably impaired" by his consumption of PCP and marijuana. **See** Appellant's Brief at 19-31.[2]

Our Supreme Court recently summarized:

> To convict a defendant of first-degree murder, the Commonwealth must prove beyond a reasonable doubt that the defendant unlawfully killed another human being, the defendant acted with the specific intent to kill, and the killing was willful, deliberate, and premeditated. The specific intent to kill may be inferred from the defendant's use of a weapon on a vital part of the victim's body. *. .* Furthermore, the Commonwealth may sustain its burden by wholly circumstantial evidence and the jury is free to believe all, part, or none of the evidence.

**Commonwealth v. Thomas**, 215 A.3d 36, 40 (Pa. 2019) (citations omitted).

Here, Appellant recites a litany of the evidence to support his contention that the trial court improperly denied his motion for a new trial. **See** Appellant's Brief at 21-30. Upon review, we disagree.

We recognize:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. **Widmer**, 744 A.2d at 751–52; [**Commonwealth v.**

---

[2] While the Commonwealth argues that Appellant's claim as it pertains to his intent is one of sufficiency and not weight—and is thus waived—we address the weight claim given Appellant's focus on the testimony and weight afforded the testimony by the jury. **See** Appellant's Brief at 21-30.

***Brown***, 648 A.2d 1177, 1189 (Pa.1994)]. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. ***Widmer***, 744 A.2d at 752. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" ***Id.*** at 320, 744 A.2d at 752 (citation omitted). It has often been stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." ***Brown***, 648 A.2d at 1189. An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. ***Brown***, 648 A.2d at 1189. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. ***Commonwealth v. Farquharson***, 354 A.2d 545 (Pa. 1976). One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

***Widmer***, 744 A.2d at 753 (emphasis added).

***Commonwealth v. Clay***, 64 A.3d 1049, 1054–55 (Pa. 2013) (citations modified).

In reviewing the trial court's exercise of discretion in this case, we discern no merit to Appellant's argument. Citing both legal authority and the record, the trial court provided a comprehensive explanation of why it denied

relief. Most pertinently:

> There was, indisputably, plenty of evidence that [Appellant] ingested PCP-laced marijuana. Toxicologically significant amounts were found in his blood and Dr. Cohn did indeed opine that [Appellant], at the time of the murder, was laboring under the psychotropic effects of PCP and marijuana. However, the mere fact of intoxication is not a defense to First Degree Murder; rather, [Appellant] must prove that his cognitive abilities of deliberation and premeditation were so compromised by voluntary intoxication that he was unable to formulate the specific intent to kill. **Commonwealth v. Bardo**, 105 A.3d 678 (Pa. 2014) []. The mere evidence of the consumption of alcohol or drugs and an appearance of intoxication is not sufficient to support a conclusion that a defendant was overwhelmed or overpowered to the point of being incapable of forming the specific intent to kill. Obviously from [case law], it is apparent that one can still possess a specific intent to kill even if he or she is under the influence of an intoxicating substance; voluntary intoxication is not a *per se* defense, or mitigating factor, as the case may be, to First Degree Murder.

> In **Commonwealth v. Cessna**, the defendant shot his sleeping stepfather in the head while under the influence of LSD. **Commonwealth v. Cessna**, 537 A.2d 834 (Pa. Super. 1988). Despite the defendant's recent use of LSD, the Superior Court determined that he still possessed the necessary faculties to be able to premeditate the deliberate death of his stepfather. **Id.** The Court noted that to negate the intent necessary for a conviction of Murder in the First Degree, a defendant must have been overwhelmed by a drug to the point of losing his faculties so as to be incapable of forming a specific intent to kill. [] The appellate Court stated that whether a defendant is so overpowered by the voluntary ingestion of an intoxicating substance is a question for the fact finder, who is free to believe any, all, or none of the testimony offered at trial. . . .

> In the matter *sub judice,* there is abundant evidence of record to support the jury's conclusion that [Appellant] harbored a specific intent to kill Grayling Chambliss, notwithstanding his voluntary intoxication. First of all, in response to Mr. Chambliss's persistent knocking on the front door of [Appellant's] girlfriend's home, [Appellant], who was in his night clothes and getting ready

for bed, came down the stairs and went to the kitchen to retrieve a butcher knife before answering the door. This clearly demonstrates that [Appellant] was contemplating the use of deadly force and the likely result that Mr. Chambliss's death might ensue therefrom. Premeditation does not require a significant passage of time. Secondly, [Appellant] stabbed Mr. Chambliss five (5) times, twice in Mr. Chambliss's lung, once in his heart, once in the aorta, and once in the abdomen, ripping out Mr. Chambliss's small intestine. [I]t is axiomatic that specific intent to kill may be inferred from the use of a deadly weapon on a vital part of the victim's body. More specifically, the use of a deadly weapon directed at a vital organ of another human being justifies a *factual presumption* that the actor intended death unless the testimony contains additional evidence that would demonstrate a contrary intent. The jury was lawfully able to infer, presume even, that by utilizing a butcher knife on vital parts of the victim's body, [Appellant] did indeed harbor the specific intent to kill Mr. Chambliss. Further, when [Appellant] was interviewed by police at the hospital a few hours after this incident occurred, he told the officer, "So I know the only rea- and the only way for me to kill this man and like to stop him from fightin' me I gotta stab him in his heart." These words indicate that [Appellant] deliberately stabbed Mr. Chambliss in the chest to kill him.

Certainly there is evidence that [Appellant] had been acting in an unusual manner prior to the murder. . . . However, immediately prior to the stabbing of Mr. Chambliss, [Appellant] was not in fact acting unusually. . . . [Appellant] went to a bar with his cousin, had a beer and played pool. Then he came home and ate dinner with his family. Subsequently, he decided that he wanted to pray [and t]here was testimony that he wept while he prayed that night. Subsequently, he appeared agitated because his prayers were repeatedly interrupted by Mr. Chambliss and he did at one point grab his girlfriend's mother's lamp and unplug it and then put it back down. However, [Appellant] did not threaten or take his agitation out on any person at that time but instead accompanied his girlfriend to their bedroom and got ready for bed, even to the point of lying down on the bed and watching the television show "Game of Thrones". This is not bizarre behavior. It was only *after* committing murder, *after* stabbing Grayling Chambliss in numerous vital parts of his body with a deadly weapon, *after* he had developed and executed his plan to kill Mr. Chambliss, that [Appellant] began to exhibit truly bizarre behavior. . . . All of this occurred *after* [Appellant] killed Mr.

Chambliss, not before. Prior to killing Mr. Chambliss, [Appellant] enjoyed a nice evening with his family and even took time to pray because he was, in his own words, feeling "blessed". Indeed, in his own testimony at trial, [Appellant] denied that he was high on PCP and marijuana at the time he committed this crime. Thus, a jury could reasonably have inferred that [Appellant's] ingestion of PCP and marijuana did not so overwhelm his faculties, particularly as the evidence also described [Appellant] as a regular and longtime user of these substances, that he could not formulate the specific intent to kill.

. . . [T]he weight of the evidence favors the jury's conclusion that [Appellant] possessed the requisite mental faculties and sensibilities to formulate the specific intent to kill Mr. Chambliss and did indeed formulate and possess, as well as act upon, that intent.

Trial Court Opinion, 3/27/19, at 11-16 (citations to notes of testimony and some case law omitted). Consistent with the foregoing, we find no merit in Appellant's first issue.

In his next three issues, Appellant assails the trial court's actions in (1) directing the defense to disclose "raw data" relied upon by their mental health expert, Dr. Cooke; (2) failing to sanction the Commonwealth "for disclosing an EMT report after the parties had picked a jury"; and (3) allowing police body camera footage depicting the decedent's body. *See* Appellant's Brief at 5.

In response, the Commonwealth, *inter alia*, (1) cites Pennsylvania Rule of Criminal Procedure 569 and Rule of Evidence 705 to support the disclosure of the expert's raw data; (2) states that it was unaware of and only received the EMT report "during jury selection, but the jury had not been sworn," after which the trial court granted a curative continuance providing Appellant with

three additional months to prepare for trial; and (3) argues that admission of the video of the decedent's body was not inflammatory where it "only showed the victim's wounds for a few seconds" with the purpose of showing the jury where the murder occurred. *See* Commonwealth Brief at 8, 30-31, 45-48, 52-53.

We review Appellant's claims cognizant that "[a] trial court has broad discretion to determine whether evidence is admissible," and the court's ruling regarding the admission of evidence "will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous." ***Commonwealth v. Huggins***, 68 A.3d 962, 966 (Pa. Super. 2013).

With respect to Appellant's second issue, the record confirms that Appellant had "plenty of time" to prepare for trial and "was not prejudiced" by the court's requirement that his expert, Dr. Cooke, disclose the data; further, we agree with the trial court that "by placing his mental health in issue . . . [Appellant] waived the psychotherapist-patient privilege." Trial Court Opinion, 3/27/19, at 18, citing ***Commonwealth v. Santiago***, 855 A.2d 682 (Pa. 2004) (defendant waived privilege by pursuing insanity defense). We also agree with the Commonwealth that Appellant "fails to cite or offer any support from the record that any of this information was actually used or how it affected/prejudiced [Appellant]." Commonwealth Brief at 26.

In his third issue concerning the EMT report, Appellant emphasizes that the trial court should have sanctioned the Commonwealth for providing the report after jury selection. *See* Appellant's Brief at 48. It is well-settled that "[d]ecisions involving discovery matters are within the sound discretion of the trial court and will not be overturned absent an abuse of that discretion." *Commonwealth v. Smith*, 955 A.2d 391, 394 (Pa. Super. 2008) (*en banc*). Further, the trial court's authority to sanction a party for a discovery violation is derived from Pa.R.Crim.P. 573(E), which states:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule[, which governs discovery matters,] the court may order such party to permit discovery or inspection, may grant a continuance, or may prohibit such party from introducing evidence not disclosed, other than testimony of the defendant, or it may enter such other order as it deems just under the circumstances.

*Commonwealth v. Jordan*, 125 A.3d 55, 65 (Pa. Super. 2015).

Here, the Commonwealth states, "it is undisputed that the Commonwealth was unaware of the existence of [Appellant's] inculpatory statements . . . until November." Commonwealth Brief at 52. Appellant concedes that "the prosecutor indicated that she did not possess or know of the contents of this report before she received it at the end of the day on November 9, 2017," but argues that the trial court, in finding that "the Commonwealth was not in control of the origin of the report," caused prejudice to Appellant by failing to "ban the information." *Id.* Appellant maintains that

the report "was clearly prejudicial to the defense strategy" that Appellant had "sustained head injuries . . . when he encountered decedent." *Id.* at 51.

To the contrary, the trial court opined that in granting the parties' joint motion for a continuance, it "tailored the remedy to the scope of the injury." Trial Court Opinion, 3/27/19, at 26. The court concluded:

> To eliminate the Commonwealth's ability to introduce evidence that calls into question the veracity of [Appellant's] assertions at trial . . . would unfairly skew the evidence presented to the jury and hinder the ability of the fact finder to evaluate the truth of both parties' theories. It would effectuate a grave injustice to the Commonwealth in great disproportion to the scope of its offense.

*Id.*

We do not discern an abuse of discretion by the trial court. The record before us is voluminous, and the EMT report (Exhibit 37) consists of two and a half pages among more than 1,000 pages of exhibits—and more than 1,000 pages of transcripts. Even if the trial court had erred in admitting the report, such error would be harmless where any prejudice is de minimis. It bears repeating that "the harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial." *Commonwealth v. Hairston*, 84 A.3d 657, 671 (Pa. 2014). Further:

> Harmless error exists if the record demonstrates either: (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

- 11 -

*Hairston*, 84 A.3d at 671–72.

Finally, in his fourth issue, Appellant asserts that the trial court erroneously admitted the police body camera footage depicting the decedent's body.

> When the Commonwealth seeks to introduce photographs of a homicide victim into evidence, the trial court must engage in a two-part analysis. First, the trial court must examine whether the particular photograph is inflammatory. If the photograph is not inflammatory, it may be admitted if it is relevant and can serve to assist the jury in understanding the facts of the case. If the photograph is inflammatory, the trial court must determine whether the photograph is of such essential evidentiary value that its need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

*Commonwealth v. Woodard*, 129 A.3d 480, 494 (Pa. 2015) (citations omitted). Here, the trial court rejected Appellant's contention that the video was inflammatory. The court expressly determined that the video footage was not inflammatory where the decedent's wounds "were not readily visible in the footage," but nonetheless gave the jury the cautionary instruction that they were not to "allow the unpleasant nature of the footage stir their emotions to the prejudice of the Defendant." *See*, *e.g.*, Trial Court Opinion, 3/27/19, at 32. We again find no abuse of discretion by the trial court, and note that the record contains other evidence—including still photographs—cumulative of the evidence in the body camera video.

For the above reasons, Appellant's claims do not merit relief. We therefore affirm the judgment of sentence.

Judgment of sentence affirmed.

Judge Colins joins the memorandum.

Judge Nichols concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/4/20